## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JODY S.,

     *Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

     *Defendant.*

_____/

Case No. 1:24-cv-11915

Patricia T. Morris
United States Magistrate Judge

## MEMORANDUM OPINION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 9, 11)

## I.    CONCLUSION

For the reasons set forth below, Plaintiff Jody S.'s Motion for Summary Judgment will be **DENIED** (ECF No. 9), Defendant the Commissioner of Social Security's Motion for Summary Judgment will be **GRANTED** (ECF No. 11), and the final decision of the Administrative Law Judge ("ALJ") will be **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On April 29, 2022, Plaintiff filed an application for Disability Insurance Benefits, alleging that she became disabled on December 21, 2021. (ECF No. 6-1, PageID.31). The Commissioner denied the application initially on November 16,

2022, and on reconsideration on February 1, 2023. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held telephonically on July 18, 2023. (*Id.* at PageID.31, 47–79). The ALJ issued a written decision on September 27, 2023, finding that Plaintiff was not disabled. (*Id.* at PageID.28–47). Following the ALJ's d333ecision, Plaintiff requested review from the Appeals Council and the Council denied her request on May 30, 2024. (*Id.* at PageID.15–19).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on July 25, 2024. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment on all post-judgment matters." (ECF No. 8). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 9, 11) as well as Plaintiff's response to the Commissioner's motion (ECF No. 12).

## B.   Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A).  The Commissioner's regulations provide that disability

is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 3336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the

claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her [residual functional capacity ("RFC")] and considering relevant vocational factors."  *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled.  (ECF No. 6-1, PageID.42).  At Step One, the ALJ found that Plaintiff met the insured status requirements through December 31, 2031, and that she had not engaged in substantial gainful activity since December 21, 2021, the alleged onset date.  (*Id.* at PageID.33).  At Step Two, the ALJ found the following impairments severe: degenerative disc disease of the cervical spine with radiculopathy and stenosis; peripheral neuropathy of the lower extremities; and diabetes mellitus, type II.  (*Id.* at PageID.34).  At Step Three, the ALJ found that none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.35).

Next, the ALJ found that Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally lift and/or carry including upward pulling twenty pounds, she can frequently lift and/or carry including upward pulling ten pounds, she can stand and or walk with normal breaks for a total of four hours in an eight-hour hour workday and sit with normal breaks for a total of about six hours in an eight-hour hour workday.  She can occasionally climb ramps and stairs.  She can never climb ladders, ropes and scaffolds.  She can frequently balance.  She can occasionally stoop defined as bending at the waist, kneel, crouch defined as bending at the knees and never crawl.  She is to avoid concentrated exposure to extreme cold, extreme heat, and wetness.  She is to avoid all exposure to unprotected heights and dangerous machinery.  Moreover, she can occasionally reach overhead and occasionally use foot controls.

(*Id.* at PageID.36).

At Step Four, the ALJ found that Plaintiff was "capable of performing past relevant work as a medical office receptionist."  (*Id.* at PageID.41).  The ALJ explained that "[t]his work does not require the performance of work-related activities precluded by" Plaintiff's RFC.  (*Id.*).  Because the ALJ found that Plaintiff could perform past relevant work at Step Four, she did not need to reach Step Five of the sequential analysis before concluding that Plaintiff was not disabled, as defined in the Social Security Act, at any time from December 21, 2021, through the date of the decision.  (*Id.* at PageID.42).

### E.   Administrative Record

Plaintiff raises two issues on appeal.  First, she argues that the ALJ erred when she failed to either include or adequately explain her reasons for not including any

functional limitations in the RFC related to Plaintiff's mental impairments.  Second, she argues that the ALJ erred by failing to consider Plaintiff's vision impairments as severe and by failing to incorporate any functional limitations in the RFC related to these impairments.  Thus, while the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

### 1.   Mental Impairments

On May 29, 2021,[1] Plaintiff had an appointment with her primary care provider ("PCP")—Tammy Kiker, CNP ("NP Kiker")—to address issues including anxiety.  (ECF No. 6-1, PageID.383).  NP Kiker found Plaintiff's mood and behavior normal.  (*Id.*).  She prescribed Plaintiff Ativan for anxiety and Ambien for primary insomnia.  (*Id.*).  Plaintiff was instructed to take one .5 mg tablet of Ativan every night and one 10 mg tablet of Ambien nightly as needed.  (*Id.*).

On December 17, 2021, Plaintiff met with a specialist to discuss her treatment plan for cervical spine pain.  (*Id.* at PageID.525).  Plaintiff was screened for depression using the PHQ-9 and PHQ-2.  (*Id.* at PageID.526).  She scored "14" on the PHQ-9 and "5" on the PHQ-2, suggesting "Moderate Depression."  (*Id.*).  On examination, Plaintiff made "good eye contact," had "full range" of "mood/affect," and was "not anxious appearing."  (*Id.* at PageID.527).  Additionally, she reportedly

---

[1] The Undersigned notes that this visit occurred over six months prior to Plaintiff's alleged onset date of December 21, 2021.

denied experiencing any depression, change in personality, or anxiety. (*Id.* at PageID.528).

On January 19, 2022, at her next office visit for pain management, Plaintiff was again screened for depression using the PHQ-2. (*Id.* at PageID.517–18). She scored "0," which is the lowest possible score. (*Id.* at PageID.518–19). On examination, the provider noted that Plaintiff made "good eye contact," had "full range" of "mood/affect," and was "not anxious appearing." (*Id.* at PageID.519). Plaintiff reportedly denied experiencing any depression, change in personality, or anxiety. (*Id.* at PageID.520).

A few weeks later, at an emergency room follow-up visit on February 8, 2022, NP Kiker reviewed Plaintiff's current medical problems, which still included anxiety and primary insomnia. (*Id.* at PageID.349, 351). Relevantly, NP Kiker documented that Plaintiff had "increased her Ativan to [ ] 1.5 tabs daily" due to stress caused by caring for her father with Alzheimer's disease. (*Id.* at PageID.349). Plaintiff's insomnia was well managed by taking Ambien as needed. (*Id.*).

At a February 8, 2022 neurology appointment, it was noted that Plaintiff was

> taking some time off work to help her father with his health conditions and although this is still very stressful [that] she has noticed overall improvement in her well-being with the removal of the added stress from work. Overall she feels she is stable except for some fatigue since her UTI.

(*Id.* at PageID.510). Plaintiff reported experiencing anxiety and depression but

denied experiencing any hallucinations or suicidal thoughts. (*Id.* at PageID.513).

On March 9, 2022, a nurse practitioner performed a psychiatric evaluation to ensure that Plaintiff was a "suitable spinal cord stimulator candidate." (*Id.* at PageID.506). Following this evaluation, the nurse practitioner concluded that Plaintiff's pain was "not psychological in origin" and that she was thus an "appropriate candidate for the stimulator." (*Id.* at PageID.506–07). Plaintiff was screened for depression using the PHQ-9 and PHQ-2. (*Id.* at PageID.507–08). She scored "12" on the PHQ-9 and "2" on the PHQ-2, suggesting "Moderate Depression." (*Id.*). On examination, Plaintiff again made "good eye contact," had "full range" of "mood/affect," and was "not anxious appearing." (*Id.* at PageID.508). Additionally, she reportedly denied experiencing any depression, change in personality, or anxiety. (*Id.* at PageID.509).

At an April 14, 2022 appointment for spinal cord stimulator treatment, Plaintiff's provider, Joseph N. Atallah, M.D., screened her for depression using the PHQ-9. (*Id.* at PageID.491). Plaintiff's score was "1," suggesting "Minimal Depression." (*Id.*). Dr. Atallah noted that on examination, Plaintiff made "good eye contact," had "full range" of "mood/affect," and was "not anxious appearin[g]." (*Id.* at PageID.492). Plaintiff also reportedly denied experiencing any depression, change in personality, or anxiety. (*Id.* at PageID.494). Plaintiff's observed and reported psychiatric symptoms at this visit are consistent with those from visits

occurring on March 10, 2022, and April 11, 2022.  (*Id.* at PageID.496, 499, 503, 505).

A few months later, Plaintiff had an appointment with Tammy Kuron, N.P. ("NP Kuron") to obtain medical clearance for the spinal cord stimulator implant procedure.  (*Id.* at PageID.635).  Plaintiff reported that she was still taking Ativan to manage her anxiety and Ambien to manage her insomnia and that she was "[d]oing well."  (*Id.* at PageID.636).  Around the same time, Plaintiff had a neurology appointment where reported that "the pains and discomfort of her feet remains severe and at time[s] she feels . . . 'miserable.' "  (*Id.* at PageID.708).  She also reported that her symptoms "can interfere with her sleep."  (*Id.*).  However, she reportedly denied experiencing any anxiety, hallucinations, depressed mood, or suicidal thoughts.  (*Id.* at PageID.711).

On September 20, 2022, Plaintiff had an appointment with Dr. Atallah to discuss how she had been feeling since having her spinal cord stimulator implant procedure.  (*Id.* at PageID.581).  Plaintiff reported "excellent relief of pain" and denied experiencing depressed mood, depression, change in personality, or anxiety. (*Id.* at PageID.584).  On examination, Dr. Atallah found that Plaintiff made "good eye contact," had "full range" of "mood/affect," and was "not anxious appearing." (*Id.* at PageID.581).  These findings and reported symptoms are consistent with Dr. Atallah's records for visits that occurred on August 22, 2022 (*id.* at PageID.601,

603), August 29, 2022 (*id.* at PageID.595, 597–98), and September 6, 2022 (*id.* at PageID.593). Similarly, at a September 8, 2022 neurologist appointment, Plaintiff reportedly denied experiencing any anxiety, hallucinations, depressed mood, or suicidal thoughts. (*Id.* at PageID.589).

Plaintiff had her annual physical examination on October 27, 2022, with NP Kuron. (*Id.* at PageID.618). Plaintiff's anxiety was treated by taking Ativan once or twice a day and her insomnia was treated by taking Ambien nightly. (*Id.*). NP Kuron wrote the following in the "Psychiatric/Behavioral" section of her review of Plaintiff's systems: "Positive for sleep disturbance. Negative for dysphoric mood. [She] is not nervous/anxious." (*Id.* at PageID.620). On examination, NP Kuron found Plaintiff's mood and behavior normal. (*Id.* at PageID.622).

At a January 11, 2023 neurology appointment, Plaintiff reportedly denied experiencing anxiety, hallucinations, depressed mood, or suicidal thoughts. (*Id.* at PageID.721). She denied the same at February 9, 2023 and March 21, 2023 appointments with Dr. Atallah. (*Id.* at PageID.725, 729). Dr. Atallah's examination notes from both visits indicate that Plaintiff made "good eye contact," had "full range" of "mood/affect," and was "not anxious appearing." (*Id.* at PageID.722, 727).

Most recently, on April 27, 2023, Plaintiff had an appointment with NP Kuron who noted the following: "She is prescribed Ativan twice a day for anxiety which also helps sleep at night. She also takes Ambien 1 tablet nightly. She sleeps well.

Denies any side effects." (*Id.* at PageID.732). NP Kuron indicated that Plaintiff did not have a dysphoric mood and was not nervous or anxious. (*Id.* at PageID.733).

### 2. Vision Impairments

At an August 5, 2021 neurology appointment, the provider noted that Plaintiff "is not having double vision, loss of vision." (ECF No. 6-1, PageID.542). On September 8, 2022, the same provider noted that Plaintiff "is not having double vision or loss of vision." (*Id.* at PageID.576). Additionally, Plaintiff reportedly denied experiencing diplopia (double vision), blurred vision, or eye pain at numerous other appointments, including on October 6, 2021 (*id.* at PageID.543), February 8, 2022 (*id.* at PageID.502), and June 9, 2022 (*id.* at PageID.490).

On September 29, 2022, Plaintiff was seen by Marla Price, D.O., for a consultative examination to assess her alleged vision impairments. (*Id.* at PageID.608–09). Dr. Price described Plaintiff as follows:

> This pleasant 57-year-old female has a history significant for Diabetes Mellitus, severe Peripheral Neuropathy, Spinal stenosis and resulting muscle weakness. This is the first time that [she] is applying to disability and she is applying primarily due to her neuropathy and limited mobility. From a vision standpoint she does have decreased vision due to some diabetic macular edema affecting both eyes. She does state that she was previously working as a receptionist for a doctor's office however she had to quit when she was no longer able to see the small font to record information in their EMR system. Presently she does not drive but is able to help out at home. Her husband provides her with transportation.

(*Id.* at PageID.608). Following examination, Dr. Price listed Plaintiff's diagnoses

as

1.      Type 2 Diabetes Mellitus with mild non-proliferative diabetic retinopathy OU

2.      History of Diabetic Macular Edema OU

3.      Nuclear Sclerotic Cataracts OU

(*Id.* at PageID.609).  In summary, she provided that Plaintiff

is a 57-year-old female who suffers from diabetes mellitus, spinal stenosis and severe peripheral neuropathy who is applying for disability.  As stated, [Plaintiff] is primarily applying due to her neuropathy but her vision has been affected by her diabetic changes and had forced her to quit her most recent employment.

We recommend that she continues to follow with her ophthalmology and endocrinologist for continued care.

(*Id.*).

## F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.

An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

     (i)     A licensed or certified psychologist at the independent practice level; or

     (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).  A medical source is

> an individual who is licensed as a healthcare worker by a State and
> working within the scope of practice permitted under State or Federal
> law, or an individual who is certified by a State as a speech-language
> pathologist or a school psychologist and acting within the scope of
> practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is

not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1)

[the claimant]; (2) Educational personnel (for example, school teachers, counselors,

early intervention team members, developmental center workers, and daycare center

workers); (3) Public and private social welfare agency personnel; and (4) Family

members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration ("SSA") "will not defer or give any

specific evidentiary weight, including controlling weight, to any medical opinion(s)

or prior administrative medical findings, including those from [the claimant's]

medical sources."  *Id.* § 404.1520c(a).  "The most important factors [the SSA]

consider[s] when [it] evaluate[s] the persuasiveness of medical opinions and prior

administrative medical findings are supportability (paragraph (c)(1) of this section)

and consistency (paragraph (c)(2) of this section)."  *Id.*  The SSA will consider

several factors when it contemplates "the medical opinion(s) and prior

administrative medical findings" in a case.  *Id.*

The first factor is "supportability."  For this factor, "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion.  In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with [the] claimant[.]"  *Id.* § 404.1520c(c)(3).  This factor will include the analysis of:

(i)     Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)    Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)   Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)    Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help

> demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

> (v) Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder[.]

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative

medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record.

*Id.* § 404.1520c(b)(1).

> Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous

19

level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether [the claimant is] disabled;" and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i)  Statements that [the claimant] [is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments[];
>
> (iii) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels [] instead of descriptions about [the claimant's] functional abilities and limitations[];
>
> (iv) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work[];
>
> (v)  Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule[]; and
>
> (vi) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that

> [b]ecause a decision by any other governmental and nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in its

determination or decision about a decision made by any other governmental or nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in

which the SSA evaluates symptoms, including pain.

> In considering whether [the claimant is] disabled, [the SSA] will
> consider all [the claimant's] symptoms, including pain, and the extent
> to which [the claimant's] symptoms can reasonably be accepted as
> consistent with the objective medical evidence and other evidence.
> [The SSA] will consider all [the claimant's] statements about [his or
> her] symptoms, such as pain, and any description [the claimant's]
> medical sources or nonmedical sources may provide about how the
> symptoms affect [the claimant's] activities of daily living and [his or
> her] ability to work[.]

*Id.* § 404.1529(a).  But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone
> establish that [the claimant is] disabled.  There must be objective
> medical evidence from an acceptable medical source that shows [the
> claimant has] a medical impairment(s) which could reasonably be
> expected to produce the pain or other symptoms alleged and that, when
> considered with all of the other evidence (including statements about
> the intensity and persistence about [the claimant's] pain or other
> symptoms which may reasonably be accepted as consistent with the
> medical signs and laboratory findings), would lead to a conclusion that
> [the claimant is] disabled.

*Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of [the claimant's]

symptoms, including pain, [the SSA] will consider all of the available evidence,

including [the claimant's] medical history, the medical signs and laboratory findings,

and statements about how [the claimant's] symptoms affect [him or her]."  *Id.* §

404.1529(a).  The SSA clarified that it will "then determine the extent to which [the

claimant's] alleged functional limitations and restrictions due to pain or other

symptoms can reasonably be accepted as consistent with the medical signs and

laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of the claimant's symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the Claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons[.]

*Id.* The regulations establish that "[f]actors relevant to [a claimant's] symptoms, such as pain, which [it] will consider include []:

(i)     [D]aily activities;

23

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

24

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

## G.    Argument and Analysis

As stated above, Plaintiff raises two issues on appeal.  First, she argues that the ALJ erred when she failed to either include or adequately explain her reasons for not including any functional limitations in the RFC related to Plaintiff's mental impairments.  Second, she argues that the ALJ erred by failing to consider Plaintiff's vision impairments as severe and by failing to incorporate any functional limitations in the RFC related to these impairments.  Each issue will be considered in turn below.

### 1.    Mental Impairments

Plaintiff first argues that the ALJ erred when, after finding that Plaintiff "has 'mild' limitations in the ability to concentrate, persistent, or maintain pace; and in adapting or managing herself," she failed to include functional limitations in the RFC related to these findings.  (ECF No. 9, PageID.751 (citing ECF No. 6-1, PageID.35)).

Twenty C.F.R. § 416.945(e) provides that the ALJ will consider the "limiting

25

effects of all [of a claimant's] impairment(s), even those that are not severe, in determining [their] residual functional capacity."  Social Security Ruling ("SSR") 96-8p further provides, in relevant part, that

> 1.   Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> …
>
> 5.   RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*.
>
> 6.   Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional.  It is the functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional.

SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996) (emphasis in original).  Moreover,

> [i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."  While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.  For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

*Id.* at *5.

At issue here is whether the ALJ properly accounted for Plaintiff's nonsevere mental impairments when crafting the RFC.  Early in her Step II analysis, the ALJ

explained that Plaintiff

> has also been diagnosed with anxiety, depression, obesity, diabetic
> macular edema, and bilateral cataracts.  These impairments are not
> "severe" impairments within the meaning of the Social Security Act
> and Regulations because there is no evidence that these conditions
> cause more than minimal limitations on [Plaintiff's] ability to perform
> work-related activities (20 CFR 404.1522, 404.1529; SSRs 85-28 and
> 16-3p).    Nevertheless, the undersigned has accounted for all
> impairments in the residual functional capacity as necessary taking into
> account the totality of the record.

(ECF No. 6-1, PageID.34).  The ALJ went on to explain that Plaintiff's

> medically determinable mental impairments of anxiety and depression,
> considered singly and in combination, do not cause more than minimal
> limitation in [her] ability to perform basic mental work activities and
> are therefore nonsevere.
>
> In making this finding, the undersigned has considered the broad
> functional areas of mental functioning set out in the disability
> regulations for evaluating mental disorders and in the Listing of
> Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four
> broad functional areas are known as the "paragraph B" criteria.  In these
> areas, [Plaintiff] has the following degree of limitation: no limitations
> in understanding, remembering, or applying information, no limitations
> in interacting with others, *mild limitations in concentrating, persisting,
> or maintaining pace*, and *mild limitations in adapting or managing
> oneself*.   The undesigned notes that [Plaintiff's] psychological
> impairments were treated conservatively, with medication, and the file
> does not contain any evidence of inpatient hospitalizations related to
> her mental health impairments.
>
> State agency consultants reviewed the file at the initial, and
> reconsideration, levels, and they opined that [Plaintiff's] psychological
> impairments were not severe.  (Ex. 2A pg. 4; Ex. 4A pg. 4).  The
> undersigned has considered these opinions and finds that they are
> persuasive.  These opinions are supported by the evidence in the file at
> the time of their review, and they are consistent with other information
> in the file.  Tammy Kuron, CNP, followed up with [Plaintiff] on June

29, 2022, and stated that her anxiety was doing well on Ativan.  (Ex. 5F pg. 25).   Additionally, multiple treatment records found that [Plaintiff] had a normal mood and affect.  (Ex. 5F pgs. 11, 22; Ex. 7F pgs. 6, 11).

Because [Plaintiff's] medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in [Plaintiff's] ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment.  *The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.*

(*Id.* at PageID.34–35 (emphasis added)).

In the analysis supporting the RFC determination, the ALJ summarized Plaintiff's hearing testimony.  (*Id.* at PageID.37).  With regard to Plaintiff's mental impairments, the ALJ first noted that Plaintiff "testified that she had difficulty with her focus and keeping up with tasks and she needed directions repeated to her." (*Id.*). The ALJ also noted that Plaintiff "testified that she had days where she was unable to get out of bed, her neck pain caused issues focusing, and her medications made her 'foggy and loopy,' and it was difficult to focus."  (*Id.*).

The ALJ credited some of Plaintiff's testimony, explaining that

[a]fter careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be

expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(*Id.* at PageID.39).  In the ensuing analysis, the ALJ wrote the following:

Finally, [Plaintiff] testified that she had issues with her focus.  She testified that her neck pain interfered with her ability to focus, she needed directions repeated to her, and her medications caused difficulty focusing and made her feel "foggy and loopy."  This is not consistent with the evidence in the file.  In April 2023, [Plaintiff] denied side effects from her medication.  (Ex. 8F pg. 2).  However, the other records do not contain reports from [Plaintiff] that her medications caused issues with her focus.  In April 2022, [Plaintiff] was seen by Dr. Atallah and she noted no issues concentrating on things, such as reading the newspaper or watching television.  (Ex. 2F pg. 9).  Other treatment records noted that [Plaintiff] reported issues with her concentration.  (Ex. 2F pgs. 25, 44).  However, the undersigned notes that the examination at that time found that [Plaintiff] had good eye contact, she was not anxious appearing, and her mood and affect were full.  (Ex. 2F pgs. 26, 45).  Moreover, the undersigned notes that [Plaintiff] reported multiple times in the file that she was helping to care for her ill father.  (Ex. 1F pg. 13; Ex. 2F pg. 28; Ex. 8F pg. 3).  This suggests that [Plaintiff's] ability to maintain focus is not as severe as she alleged.

(*Id.* at PageID.40).  Given this analysis, the ALJ concluded that "[m]ore specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity."  (*Id.* at PageID.41).

Plaintiff argues that "even mild" mental impairments "must find adequate expression via specific functional limitations in the RFC determination or the ALJ must adequately explain their basis for not doing so."  (ECF No. 9, PageID.752). This argument is flawed at the outset because "while the regulations require the ALJ

29

to 'consider' the possible effect of a non-severe impairment on the claimant's capacity for work, there is no accompanying requirement that the RFC must include restrictions reflecting a non-severe condition in the RFC." *Plotkowski v. Comm'r of Soc. Sec.*, No. 2:20-CV-12011, 2022 WL 413371, at *6 (E.D. Mich. Jan. 18, 2022), *report and recommendation adopted sub nom. Plotkowski v. Saul*, 2022 WL 407079 (E.D. Mich. Feb. 9, 2022); *see also Shamsud-Din v. Comm'r of Soc. Sec.*, No. 16-CV-11818, 2017 WL 3574694, at *6 (E.D. Mich. July 24, 2017) ("[C]ourts in this district have found that 'mild limitations do not require incorporation into an RFC assessment.' ") (collecting cases), *report and recommendation adopted*, 2017 WL 3531438 (E.D. Mich. Aug. 17, 2017).  And while "[c]ourts in this district have also found . . . that an ALJ's failure to explain how a claimant's mild psychological limitations affect the RFC assessment may constitute reversible error where the ALJ makes no mention of the claimant's mental impairment in the RFC analysis[,]" *Shamsud-Din*, 2017 WL 3574694, at *6, this is not such a case.

Here, the ALJ properly considered the Paragraph B criteria at Step II to determine whether Plaintiff's mental impairments were severe.  Notably, the ALJ concluded her discussion of the Paragraph B criteria by stating that "[t]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (ECF No. 6-1, PageID.35).  The ALJ did not stop there.  She also discussed Plaintiff's mental

impairments in the RFC section of her decision.

In that section, the ALJ explained that she had only partially credited Plaintiff's testimony regarding her symptoms because the record did not support the level of impairments alleged by Plaintiff.  She went on to explain that Plaintiff's testimony about her difficulties focusing was unsupported by her medical records— which did not reflect any observable signs of Plaintiff's mental impairments, such as difficulty maintaining eye contact or appearing anxious—and was inconsistent with the repeated mentions throughout Plaintiff's records that she was helping to care for her ailing father.  (*Id.* at PageID.40).  Additionally, the ALJ concluded her RFC analysis by noting that "the medical findings do not support the existence of limitations greater than the above listed residual functional capacity."  (*Id.* at PageID.41).

Plaintiff's reliance on several agency policies is misplaced.  As another magistrate judge in this District explained in a similar case:

> [Plaintiff's] reliance on SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996) is unavailing.  That Ruling states only that "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by . . . even those that are not 'severe.' " *Id.* at *5.  [Plaintiff] also relies on SSR 85-15, 1985 WL 56857, at *6 (1985) ("[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment"), this Ruling refers only to "severe" impairments and nowhere states that the RFC must reflect non-severe impairments.  Likewise, SSR 83-10, 1983 WL 31251 (1983), does not state that the RFC must reflect non-severe impairments.  Moreover, SSR 83-10 pertains to Step Five findings whereas here, the ALJ found at Step Four that [Plaintiff] was capable

of her past relevant work.

*Plotkowski*, 2022 WL 413371, at *6 n.4 (internal record citation omitted).  Thus, for the same reasons explained in *Plotkowski*, Plaintiff's reliance on SSRs 96-8P, 85-15, and 83-10 is unavailing.

The most analogous case cited by either party is *Smith v. Comm'r of Soc. Sec.*, 715 F. Supp. 3d 994 (E.D. Mich. 2024).  In that case, the plaintiff also argued that the ALJ had erred when he found that the plaintiff had mild limitations in concentrating, persisting, or maintaining pace yet did not incorporate any related functional limitations in the RFC or adequately reconcile his decision not to include such functional limitations with his earlier finding of mild limitations in one of the Paragraph B criteria.  *Id*. at 998.  The court began its discussion of this issue by emphasizing that it was "cognizant of the substantial evidence standard it must apply in favor of the ALJ's determination."  *Id.*  Under this framework, the court held "that the ALJ properly considered [the plaintiff's] mental impairments in completing the RFC assessment."  *Id.*  The court's holding was supported by the following analysis:

> The ALJ found, as the statute requires, that Plaintiff had a "medically determinable mental impairment of anxiety" that "did not cause more than minimal limitation in her ability to perform basic mental work activities and was therefore non-severe."  The ALJ based his conclusion on the four "functional areas of mental functioning set out in the disability regulations for evaluating mental disorders."  The four functional areas are: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself.  The ALJ analyzed each functional area to "rate the severity of Plaintiff's mental

impairments" and determined that because Plaintiff's mental
impairment "caused no more than 'mild' limitation in any of the
functional areas and the evidence does not otherwise indicate that there
is more than a minimal limitation in the claimant's ability to do basic
work activities, it was non-severe."   Substantial evidence therefore
supports the ALJ's finding that Plaintiff had mental impairments that
were "mild" and "non-severe."

Plaintiff alleged that the ALJ "failed to incorporate mental limitations
in the residual functional capacity assessment."  Not so.  The ALJ
prefaced his RFC analysis by explaining that the "residual functional
capacity assessment reflects the degree of limitation that he found in
the mental functional analysis."  What is more, the very heading of the
RFC section of the ALJ's decision begins: "After careful consideration
of the entire record . . ."  In the RFC section, the ALJ emphasized that
his RFC finding was based on "all symptoms" and repeated several of
Plaintiff's specific mental capabilities and obstacles that the ALJ
thoroughly analyzed in the prior mental functional analysis.   For
example, the ALJ referenced Plaintiff's one-hour attention span, her
limited socialization, her self-assessment "that she did not finish what
she started," her panic attacks, and her anxiety.  The ALJ also noted
that Plaintiff "attended church once per week," "reported that she
followed instructions 'pretty well,' " and "denied difficulty getting
along with authority figures."   The ALJ also stated that his RFC
assessment "reflects the degree of limitation the undersigned has found
in the . . . mental functional analysis."  After a thorough review of
Plaintiff's physical and mental impairments, the ALJ concluded that
Plaintiff was capable of "sedentary level residual functional capacity."
In sum, the ALJ adequately incorporated Plaintiff's mental
impairments into the RFC analysis.

Plaintiff also argued that the ALJ failed to adequately explain why he
did not account for any mental limitations in the RFC analysis.  But the
ALJ was not required to specifically discuss each non-severe
impairment in the RFC assessment to demonstrate that the impairments
were considered.  Plaintiff cited *Rodriguez v. Comm'r of Soc. Sec.*, No.
20-cv-13372, 2022 WL 4359541, at *3 (E.D. Mich. Sept. 20, 2022), for
the proposition that identifying mental impairments as mild is no
substitute for explaining why the RFC did not include any functional
limitations stemming from the impairments.  But *Rodriguez* is not

binding authority, and other Courts in the Sixth Circuit have concluded that mild mental impairments need not be incorporated into an RFC assessment. Thus, even if the ALJ failed to adequately explain why and to what extent he considered Plaintiff's mental impairments in arriving at his RFC determination, he did not err.

To be sure, other courts in this district have found that an ALJ's failure to explain how a claimant's mild mental impairments affect the RFC determination can constitute reversible error if the ALJ did not address the claimant's mental impairments in reaching his RFC determination. But as noted, the ALJ specifically mentioned Plaintiff's mental impairments in his RFC analysis. What is more, the ALJ clearly stated that his determination was based on the entire record and all of Plaintiff's symptoms, mental and physical. The ALJ therefore did not err.

*Id*. at 998–1000 (cleaned up).

Here, like in *Smith*, the ALJ's decision included statements such as the RFC "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" (ECF No. 6-1, PageID.35), the record evidence "suggests that [Plaintiff's] ability to maintain focus is not as severe as she alleged" (*id.* at PageID.40), and "the medical findings do not support the existence of limitations greater than the" RFC (*id.* at PageID.41). Additionally, she provided several paragraphs of analysis at Step II addressing the Paragraph B criteria and a paragraph of analysis in the RFC section explaining why she found that Plaintiff's mental impairments were less severe than alleged.

In sum, the ALJ followed all applicable laws and regulations when evaluating Plaintiff's mental impairments. She did not err when crafting the RFC because she

34

was not required to incorporate any functional limitations after finding that Plaintiff

had mild limitations in concentrating, persisting, or maintaining pace and in adapting

or managing herself.  Nor was she required to explain more explicitly why she chose

not to incorporate such functional limitations.  Thus, the ALJ's consideration of

Plaintiff's mental impairments is not cause for remand.

### 2.    Vision Impairments

Plaintiff's next issue on appeal is twofold.  First, she argues that the ALJ erred

at Step Two by not finding that Plaintiff's vision impairments are severe.  Second,

she argues that regardless of severity, the ALJ erred by failing to incorporate any

vision related limitations in the RFC.

As to the first, the Sixth Circuit has explained that

> "[t]he fact that some of [a claimant's] impairments were not deemed to
> be severe at step two is . . . legally irrelevant" where other impairments
> are found to be severe.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th
> Cir. 2008).  An erroneous finding of nonseverity at step two is therefore
> harmless where the ALJ properly considers nonsevere impairments at
> later steps.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240,
> 244 (6th Cir. 1987) (concluding that an ALJ's finding that a condition
> was nonsevere "could not constitute reversible error" where the ALJ
> "properly could consider . . . [the] condition" at the remaining steps);
> *see also Gray v. Comm'r of Soc. Sec. Admin.*, 365 F. App'x 60, 61 (9th
> Cir. 2010) (holding that a finding of nonseverity at step two was legally
> irrelevant where the ALJ complied with SSR 96-8p's requirements,
> even where the ALJ did not specifically reference nonsevere
> impairments in the residual-functional-capacity analysis).

*Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020).  Because the ALJ

found that Plaintiff had several severe impairments, it is legally irrelevant whether

her vision impairments were considered severe or not so long as the ALJ "properly considered [Plaintiff's] nonsevere impairments at later steps." *Id.* The *Emard* court also highlighted that "[d]istrict courts in this circuit have held an ALJ need not specifically discuss all nonsevere impairments in the [RFC] assessment *when the ALJ makes clear that her decision is controlled by SSR 96-8p.*" *Id.* at 851–52 (emphasis added).

Much of the analysis in the preceding subsection is equally applicable here. As noted above, the ALJ explained at Step II that Plaintiff

> has also been diagnosed with anxiety, depression, obesity, diabetic *macular edema*, and *bilateral cataracts*. These impairments are not "severe" impairments within the meaning of the Social Security Act and Regulations because there is no evidence that these conditions cause more than minimal limitations on [Plaintiff's] ability to perform work-related activities (20 CFR 404.1522, 404.1529; SSRs 85-28 and 16-3p). Nevertheless, the undersigned has accounted for all impairments in the residual functional capacity as necessary taking into account the totality of the record.

(ECF No. 6-1, PageID.34 (emphasis added)). Following this explanation, the ALJ specifically addressed Plaintiff's alleged vision impairments, writing:

> Regarding her vision, [Plaintiff] testified that she had fluid behind her eyes, which caused dark spots in her vision. She had drops for her eyes, however she was behind in her treatment due to a lack of insurance. Additionally, [Plaintiff] testified that she sometimes had to close her left eye, she had issues seeing smaller print, and she did not read instructions because she cannot see them. These allegations are not supported by the evidence in the file. On September 29, 2022, [Plaintiff] was seen by Marla Price, D.O., for a consultative examination, and she found that [Plaintiff] had only mild non-proliferative diabetic retinopathy. (Ex. 4F pg. 3). The undersigned

finds that this is not a medical opinion.  A medical opinion is a statement from a medical source about what an individual could still do despite their impairments and whether they have one or more impairment-related limitations or restrictions in their ability to perform physical, or mental demands of work activities, the ability to perform other demands of work such as seeing, hearing, or using other senses, or an individual's ability to adapt to environmental conditions, such as temperature extremes or fumes.  (20 CFR 404.1513(a)(2)).  Moreover, while Dr. Price noted that the claimant had some decreased vision due to macular edema, she did not opine any limitations regarding [Plaintiff's] vision.  (Ex. 4F pgs. 2, 3).  Dr. Price did not recommend any specific treatment, and the record does not contain evidence of regular treatment related to [Plaintiff's] eyes.  (Ex. 4F pg. 3).  However, the undersigned has considered this non-opinion evidence and finds that it supports the conclusion that [Plaintiff's] macular edema and cataracts are not severe impairments.

(*Id.*).

The ALJ's assessment of Plaintiff's vision impairments is supported by substantial evidence.  As the Commissioner points out, Dr. Price's diagnoses alone do not suggest that Plaintiff's vision impairments are severe.  For example, she diagnosed Plaintiff with "mild non-proliferative diabetic retinopathy" and " '[n]on-proliferative diabetic neuropathy (NPDR) is the *early stage of the disease in which symptoms will be mild or nonexistent*.' "  (ECF No. 11, PageID.793 n.2 (emphasis added)).[2]  Additionally, the Commissioner correctly explains that

while Dr. Price found that Plaintiff had decreased vision, she determined that Plaintiff's best corrected vision was 20/60-1 in her right eye and 20/60 in her left eye (ECF No. 6-1, PageID.608).  "When the

_____

[2] Quoting *Diabetic Retinopathy*, American Optometric Association, *available at* https://www.aoa.org/healthy-eyes/eye-andvision-conditions/diabetic-retinopathy?sso=y (last accessed Nov. 7, 2024).

vision in the better eye with the best possible glasses correction is: 20/30 to 20/60, this is considered *mild vision loss, or near-normal vision*."

(*Id.* at PageID.794 n.3 (emphasis added)).[3]   Additionally, as the Commissioner argues, even though Plaintiff is correct that "the state agency medical consultants found Plaintiff's 'visual disturbance' to be a severe impairment, they nonetheless concluded that she required no visual limitations." (*Id.* at 794 (citing ECF No. 6-1, PageID.84–86, 93–95)).

While Plaintiff argues that the ALJ ignored the opinions of the state agency medical consultants and Dr. Price, this is not the case. The ALJ explained that her finding that Plaintiff's vision impairments were nonsevere was *supported* by Dr. Price's evaluation. (ECF No. 6-1, PageID.34). This was because "Dr. Price did not recommend any specific treatment, and the record does not contain evidence of regular treatment related to [Plaintiff's] eyes." (*Id.*).

Further, the ALJ's determination that Dr. Price's evaluation should not be treated as a "medical opinion" is supported by substantial evidence. As the ALJ correctly explained, "[a] medical opinion is a statement from a medical source about what an individual could still do despite their impairments and whether they have one or more impairment-related limitations or restrictions in their ability to perform

---

[3] Quoting *Low Vision and Vision Rehabilitation*, American Optometric Association, *available at* https://www.aoa.org/healthy-eyes/caring-for-youreyes/low-vision-and-vision-rehab?sso=y (last accessed Nov. 7, 2024).

[the physical, mental, or other] demands of work activities." (*Id.* (citing 20 C.F.R.

§ 404.1513(a)(2)).  To be considered a medical opinion on vision impairments, a

medical professional would need to address how the impairments affected a

claimant's "ability to perform other demands of work, such as seeing, hearing, or

using other senses[.]" 20 C.F.R. § 404.1513(a)(2)(iii).  Dr. Price did not do so.

The only information about the impact of Plaintiff's vision impairments on

her abilities was Dr. Price's documentation of Plaintiff's reported symptoms.

Plaintiff's reported symptoms do not become medical opinion evidence merely by

virtue of being included in a medical record.  *See* 20 C.F.R. § 404.1513(a)(4)

("Evidence from nonmedical sources is any information or statement(s) from a

nonmedical source (including you) about any issue in your claim.  We may receive

evidence from nonmedical sources either directly from the nonmedical source or

indirectly, such as from forms we receive and our administrative records.").  Finally,

as the Commissioner persuasively argues

> the record belies Plaintiff's claim that her vision caused her to quit her
> job.  At the administrative hearing, Plaintiff testified that she was
> unable to work due to her neuropathy and neck pain; she did not testify
> that she left her job due to any vision-related issues (ECF No. 6-1,
> PageID.45–46).  While Plaintiff complained that she had difficulty
> reading small print, she also testified that she was able to read, watch
> television, scroll through Facebook, play games on her phone, use her
> husband's computer, and drive (ECF No. 6-1, PageID.39–40, 46, 50–
> 52, 54).  In addition, Plaintiff told her providers that she was "taking
> time off work" to care for her ill father, and that she eventually "lost
> her job" and "now ha[d] time to care for her father" (ECF No. 6-1,
> PageID.510, 679).  She did not indicate at any point that she quit her

> job due to vision problems. In fact, as discussed above, Plaintiff
> routinely denied experiencing any visual disturbances or eye-related
> issues at her medical appointments (*see, e.g.*, ECF No. 6-1, PageID.350,
> 490, 498, 512, 584, 588-589, 597, 602, 620, 632, 636, 685, 695, 704,
> 720, 733).

(ECF No. 11, PageID.798–99).

As discussed at length above, "the ALJ was not required to specifically discuss each non-severe impairment in the RFC assessment to demonstrate that the impairments were considered." *Smith*, 715 F. Supp. 3d at 999 (collecting cases). Because the ALJ's decision clearly sets forth both why she found Plaintiff's vision impairments to be nonsevere and that she nonetheless "accounted for all impairments in the residual functional capacity as necessary taking into account the totality of the record" (ECF No. 6-1, PageID.34), the Court finds no legal error in either the analysis of Plaintiff's vision impairments or the RFC finding. Moreover, the ALJ's decision is supported by substantial evidence, including Plaintiff's reported symptoms from various medical appointments and Dr. Price's evaluation. Therefore, the ALJ's decision must be affirmed.

## III.  **ORDER**

For these reasons, Plaintiff's motion (ECF No. 9) is **DENIED**, the Commissioner's motion (ECF No. 11) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

Date: July 25, 2025                    S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge